UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
DUNKIN' DONUTS INCORPORATED,

                Plaintiff,

          - against -

GOT-A-LOT-A-DOUGH, INC.,
CATHERINE KUNCMAN, and BEN-ZION
C. KUNCMAN, a/k/a BEN KUNCMAN,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM & ORDER**
04-CV-4100 (DRH) (MLO)

**A P P E A R A N C E S :**

**O'ROURKE & DEGEN**
Attorney for Plaintiff
225 Broadway, Suite 715
New York, NY 10007
By: Ronald D. Degen, Esq.

**STEINBERG, FINEO, BERGER & FISCHOFF, P.C.**
Attorney for Defendants
40 Crossways Park Drive
Woodbury, NY 11797
By: James E. Brandt, Esq.

**HURLEY, Senior District Judge:**

      In a Memorandum and Order dated February 10, 2006, familiarity with which is

presumed, the Court directed the parties to address the question of the appropriate temporal

parameters for the trial of this matter.  The parties having made their submissions, the Court

finds, for the reasons set forth below, that, subject to certain exceptions by way of providing

background information, the trial will be limited to the events that post-date November 23, 2004.

*BACKGROUND*

Plaintiff Dunkin' Donuts Incorporated ("Plaintiff") is the franchisor of Dunkin' Donuts franchises and the exclusive licensee of the Dunkin' Donuts trademarks. Defendants Got-a-Lot-a-Dough Inc., Catherine Kuncman and Ben Kuncman (collectively "Defendants") have owned/operated two Dunkin' Donuts franchises in Nassau County, New York since 1998 and 1999, respectively, pursuant to two franchise agreements with Plaintiff.

**I. Prior Actions Between the Parties**

A little more than one year after the second franchise agreement was signed, disputes arose between the parties. As a result, three civil actions were filed in this District, to wit: Civil Actions Nos. 01-4956; 01-6329; and 02-1098. Among other things, these actions sought judgments that the franchise agreements were terminated and prohibiting the Defendants from using the Dunkin' Donuts trademarks. Defendants answered the complaints and interposed counterclaims. For example, in Civil Action No. 02-1098, Defendants averred that Plaintiff did not provide the support and services which were outlined in the franchise agreement which would enable Defendants to avoid alleged violations and that it was Plaintiff's intent to rid itself of a successful franchisee and take back the stores to itself so it could reap the benefit of the increased value of the stores. (Answer, dated Mar. 2, 2002). The three actions were resolved by Settlement Agreement dated November 15, 2002 (the "2002 Settlement Agreement").

The 2002 Settlement Agreement provided for, among other things, the reinstatement of the franchise agreements for the purpose of allowing the Defendants to sell the franchises. It was agreed that in the event the Defendants did not transfer the franchises in accordance with the terms set forth therein, they were obligated to de-identify the franchises and comply with all post-

termination obligations set forth in the Franchise Agreement. Further, the Defendants were to execute a general release. The parties also agreed that 1) once the terminations provided for therein were released from escrow, Defendants were not entitled to remain in any franchise relationship or use the Dunkin' Donuts trademark, name, or dress and 2) in the event of breach by the Plaintiff, Defendant's exclusive remedy was a claim for monetary damages. Both parties acknowledged they had the opportunity to obtain independent legal advice of their own selection and choosing and that "[b]oth the legal and practical effect of this Agreement in each and every respect have been fully explained to the respective parties by counsel, and they *acknowledge that it is not the result of any fraud, duress or undue influence* exercised by either party upon the other party." (Emphasis added)

## II. The Current Action

On September 22, 2004, Plaintiff commenced the instant action alleging that the Defendants breached the 2002 Settlement Agreement. Plaintiff sought to enforce the 2002 Settlement Agreement and moved for a preliminary injunction.

## A. The Motion for a Preliminary Injunction

Defendants opposed the motion for a preliminary injunction[1] and submitted, *inter alia*, the affidavit of Defendant Ben Kuncman. In his affidavit, Ben Kuncman sets forth "Dunkin Donuts' scheme to terminate and appropriate our Franchises" and refers to the three federal lawsuits brought against Defendants on "trumped-up grounds." (Aff. of Ben Kuncman, sworn to Nov.17, 2004, at p. 4 (the "2004 Affidavit")).

The 2004 Affidavit also discusses the Defendants' efforts to sell the franchises — which

---

[1] No Answer to the Complaint was filed.

efforts were allegedly the result of "Plaintiffs' unlawful scheme to financially destroy the defendants and coerce them into selling their franchises." *(Id.* at ¶ 21.) It recites how Plaintiff allegedly refused to consider a July 2002 contract of sale unless there was agreement on a global settlement. That global settlement was the 2002 Settlement Agreement which provided for the mandatory sale of the franchises. *(Id.* at ¶¶ 22 - 24.) The Affidavit goes on to state how the Defendants sold the franchises and submitted the agreement to Plaintiff in December 2002 in accordance with Plaintiff's contractual right of first refusal. Plaintiff allegedly did not timely exercise its right of first refusal and instead proceeded to "ruin" the deal by trying to "flip" the franchises to the vendee at a higher price. *(Id.* at ¶¶ 26 - 27.) The Defendants again sold the franchises in March 2004 and submitted the contract of sale to Plaintiff. But Plaintiff refused to take any action with respect to the March 2004 contract unless Defendants agreed to sign a proposed "First Amendment to Agreement" and "give up more of their hard-earned rights." *(Id.* at ¶¶ 29 - 31.) Finally, Kuncman contended that the 2002 Settlement Agreement was designed to be their exit from the franchise system with all monies owed to Plaintiff to be paid from the proceeds of a sale and when Plaintiff did not entertain the sale of the stores, it knew it would trigger a default. ( *Id.* at ¶ 34.)

**B. The 2004 Settlement**

On November 23, 2004, the day of the preliminary injunction hearing, the parties settled. Several settlement documents were executed: a Stipulation of Settlement, a "First Amendment" to the 2002 Settlement Agreement, a Consent Judgment and a General Release (collectively the "2004 Settlement Documents"). Both the Stipulation of Settlement and the Consent Judgment were presented to the Court.

The Stipulation of Settlement provided that 1) Defendants consented to the entry of a judgment for both monetary damages and an injunction; 2) the parties consented to the signing of a judgment by the Court incorporating the terms of the Stipulation; and that 3) the "Stipulation and the annexed proposed judgment are subject to a Settlement Agreement dated November 15, 2002 and a First Amendment dated November 24, 2004 (collectively the "Agreement"). The judgment cannot be executed upon, except pursuant to the terms of the Agreement."

Under the terms of the First Amendment, the Defendants consented to entry of a judgment, which was signed by this Court, that provided for 1) a money judgment; 2) a judgment terminating their franchise; and 3) a permanent injunction prohibiting them from using Dunkin' Donuts' trademarks, name and dress. In exchange, Plaintiff reinstated the franchises to enable their sale and agreed to hold the Consent Judgment in escrow provided the Defendants did not breach their franchise agreements. Plaintiff was also required to consider a sales agreement between Defendants and Pradeepsinll Gohil *et al* ("Gohil Sale Agreement"). Except as specifically modified, the First Amendment ratified and confirmed the 2002 Settlement Agreement.

As part of the 2004 Settlement, the Defendants contemporaneously signed a General Release, dated November 23, 2004, which provides in pertinent part:

> GOT-ALOT-DOUGH, Inc., a New York corporation, and Ben Kuncman and Catherine Kuncman, . . . hereby release and forever discharge Dunkin' Donuts Incorporated from all debts, demands, actions, causes of action, contracts, claims, obligations and liabilities which they now have or ever had against Dunkin' Donuts Incorporated or any corporation affiliated therewith from the beginning of the world to this date arising from or in connection with the Franchise Agreements or any other agreements or transactions among the parties, including, but not limited to, any and all state or

5

federal antitrust claims, securities law claims, breach of contract claims, fraud or misrepresentation, breach of fiduciary duty, unfair trade practices (state or federal) and all other claims and causes of action whatsoever.

## C.  The Notices of Default

Little more than three months later, on February 15, 2005, Plaintiff sent Defendants a notice of default. Other notices followed on April 15, 2005 and June 6, 2005.  The notices charged  Defendants with failing to pay franchise and advertising fees.  Meanwhile, by letter dated April 28, 2005, Plaintiff  informed the Defendants that the contract for sale of the franchises to Gohil was not being approved because "the financial terms and conditions of the proposed transfer will jeopardize the ability of the buyer to maintain, operate and meet the buyer's financial obligations." Also, "[w]hile the purchase and sale agreement referred to the sale of additional term for the transferee, we are not offering the buyer additional franchise term."

On July 5, 2005, Plaintiff advised Defendants that because of their noncompliance, it was releasing the Consent Judgment from escrow.  Consequently, Plaintiff demanded that Defendants: (1) de-identify the franchises within seven days; (2) comply with all post-termination obligations set forth in the Franchise Agreements; and (3) immediately pay Dunkin' Donuts all monies due under the Franchise Agreements, the Settlement Agreement, and the First Amendment.

## D.  The Motion to Enforce the Judgment

On July 29, 2005, Plaintiff moved, by Order to Show Cause, for a "writ of assistance" and an order directing Defendants to cease using Dunkin' Donuts trademarks, name and dress. In opposition to the Order to Show Cause, Defendants cross-moved claiming that the Consent

Judgment, First Amendment and Settlement Agreement were "procured by Dunkin' Donuts by virtue of its fraud upon defendants or by its fraudulent inducement of the defendants . . . ."

In connection with the motion and the cross-motion, Defendants filed, *inter alia*, the affidavit of Ben Kuncman, sworn to September 23, 2005 (" the 2005 Kuncman Affidavit"). Paragraphs 2 to 34 of the 2005 Kuncman Affidavit are nearly identical[2] to paragraphs 2 to 34 of the 2004 Kuncman Affidavit, the content of which was described above. The affidavit then goes on to delineate Plaintiff's alleged "continuing scheme to take [Defendants'] franchise" including the failure to provide training and support and the denial of items that ensured Defendants would not be as profitable as other franchises.

By Memorandum and Order dated February 10, 2006, this Court denied Plaintiff's motion and Defendants' cross-motion because of the existence of multiple material issues of fact. Because the Defendants' submission indicated that they believed that the parties' entire troubled relationship since 1998 is relevant while Plaintiff's position was that only post November 23, 2004 events are germane, the Court raised the issue at hand – what the temporal scope of the trial should be. Specifically, the Court asked the parties to address 1) the issue of preclusion vis-a-vis the November 23, 2004 stipulation of settlement, First Amendment and corresponding judgment; 2) the significance of the general release signed contemporaneously with the First Amendment; 3) if Defendants maintain that significant pre November 23, 2004 information was unknown to them until after that date, such information should be identified with a proffer, together with argument and supporting authorities and if Defendants contend that evidence of

_____

[2]One difference is that the 2004 Affidavit refers to the First Amendment as proposed whereas the 2005 Affidavit refers to the First Amendment as signed.

duress or economic extortion related to their execution of the various documents is admissible, even if the underlying facts were known prior thereto, appropriate authority should be provided; and 4) the impact of the handwritten paragraphs inserted into the First Amendment and Consent Judgment. The Court warned that "if the submissions do not support defendants' position, no evidence, other than possible background information, will be received that predates November 23, 2004."[3] (Memorandum and Order, dated February 10, 2006, at p. 15.)

## *DISCUSSION*

### *I. The Issue of Preclusion vis-a-vis the 2004 Settlement Documents*

Defendants argue that because the 2004 Settlement Documents were procured by fraud they should be set aside and can have no preclusive affect.

"[A] settlement contract or agreement, like any other, may be attacked on the grounds that it was procured by fraud, duress or other lawful means." *First Nat'l Bank v. Pepper,* 454 F.2d 626, 632 (2d Cir. 1972). "To state a cause of action for fraud*, a* [party] must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the [party] and resulting injury." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006). When a settlement agreement or release is sought to be voided on the basis of fraud, "a party must allege every

---

[3] A party claiming fraud must "specify the statements it claims were false or misleading, give particulars as to the respect in which . . . the statements were fraudulent, state when and where the statements were made and identify those responsible for the statements." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989). *See Fed. R. Civ. P. 9(b).* Although Defendants asserted fraud and duress in response to Plaintiff's motion to enforce the judgment, there was no pleading for use by this Court to determine whether fraud and/or duress was properly pled. Accordingly, the procedural posture of this case necessitated requiring Defendants to make a proffer for their claims of fraud and duress and for this Court to address the issue in the nature of an *in limine* ruling.

material element of fraud with specific and detailed evidence in the record sufficient to establish a prima facie case." *Wright v. Eastman Kodak Co.*, 445 F. Supp. 2d 314, 318 (W.D.N.Y. 2006) (quoting *Touloumis v. Chalem*, 156 A.D.2d 230, 232-233 (1st Dept. 1989)).

Defendants allege the following misrepresentations support vacatur of the 2004 Settlement Documents on the grounds of fraud: 1) "C" rated franchises were not entitled to new product, new and more efficient equipment, in-store training, revised operating standards or other operational consultation that "A" stores were provided with, and retraining or other consulting services to correct their franchise stores' alleged deficiencies;[4] 2) Plaintiff would abide by its obligations under the franchise agreements; and 3) Plaintiff had not and would not review for approval the Gohil Sale Agreement unless Defendants first executed the First Amendment (when they allegedly had already secretly reviewed the agreement). Defendants also assert that "since November 2004" they have learned that they were singled out for disparate treatment with knowledge that said treatment would destroy them financially.

While Defendants espouse these misrepresentations in their memorandum, for the most part they fail to provide any particulars as to when, where and by whom the misrepresentations were made. In addition, Defendants fail to explain how these allegations meet the requirements for a claim of fraud. For example, there is no explanation of how the misrepresentations were material to the decision to enter into the 2004 Settlement and whether Defendants justifiably relied upon them.

---

[4]According to the parties' submissions, prior to 2004, Plaintiff's policy was that "C" rated franchises were not entitled to these items. In late 2003, Plaintiff changed that policy. Apparently Defendants' claim is that they were not advised of the change and therefore could not take advantage of it.

## A. The Misrepresentations Regarding "C" Franchises

Given the circumstances of this case, the Court finds that representations regarding the "C" franchises, and what good and services they were entitled to were not material, as a matter of law.

The purpose of the Settlement Agreements was to allow for either the sale or de-identification of the franchise; the purpose was not to allow Defendants to continue to operate the franchise. Defendants admit that both the 2002 and 2004 Settlements were designed to be their "exit from the Dunkin' Donuts franchise system." The First Amendment was entered into because the Defendants wanted Plaintiffs to consider the Gohil Sale Agreement whereby Defendants would sell their two franchises. Defendants were not going to continue to operate their franchises. Accordingly, whether as a "C" rated franchisee they would have the right to various products and services was not material to the decision whether to enter into the 2004 Settlement Documents.[5] *Cf. Wright v. Eastman Kodak,* 445 F. Supp. 2d at 319 (information about systematic discrimination not material to settlement of individual's claim of discrimination); *Wurtsbaugh v. Banc of America Sec. LLC,* 2006 WL 1683416 at *7 (S.D.N.Y. 2006) (if issue is material to one party, that party should protect itself by inserting appropriate language into the contract).

Moreover, a number of Defendants' proffers are more in the nature of failure to disclose or fraudulent concealment rather than affirmative misstatements. In order to sustain a claim for fraudulent concealment against the Plaintiff, the Plaintiff must have a duty to speak, i.e., to

---

[5] This is not to say that Defendants' cannot attempt at trial to show that Plaintiff wrongfully withheld support and services after November 23, 2004 and, therefore, caused Defendants' default under the 2004 Settlement.

disclose the material information.  *See Brass v. Am. Film Tech., Inc.,* 987 F.2d 142, 152 (2d Cir.

1993).   A duty to speak arises under New York law in three situations : "1) where the party has

made a partial or ambiguous statement, on the theory that once a party has undertaken to mention

a relevant fact to the other party it cannot give only half of the truth;" 2) "when the parties stand

in a fiduciary or confidential relationship with each other;" or 3) "where one party possesses

superior knowledge, not readily available to the other and knows that the other is acting on the

basis of mistaken knowledge." *Id.* at 150.

Defendants acknowledge that New York recognizes a duty to speak by a party to a

business transaction in these three situations, but make no attempt to identify which of the three

situations is applicable. (*See* Defendants Memorandum of Law and Factual Proffers Pursuant to

the February 10, 2006 Memorandum and Order ("Defendants' Mem") at p.4).  There is no

proffer that there was any discussion of, or that Plaintiff made mention of, the services and

products available to "C" rated franchises in connection with the negotiation of the 2004

Settlement Documents or that Plaintiff knew Defendants were acting under a mistaken belief.

Nor does any fiduciary relationship exist between a franchisee and a franchisor under New York

law.   *Marcella & Co., Inc. v. Avon Products, Inc.*, 282 A.D.2d 718, 724 N.Y.S.2d 192 (2d Dept.

2001); *McDonald's Corp. v. Hinksman*, 1999 WL 441468 at *5-6 (E.D.N.Y. 1999).  As there is

no basis for finding a duty to speak, Defendants' assertion that the 2004 Settlement Documents

are void as a result of Plaintiff's fraudulent concealment of the change in policy toward "C"

franchises must fail.

Nor are Defendants' claims of fraud supportable by the alleged misrepresentations

regarding either Plaintiff abiding by its obligations under the Franchise Agreements or Plaintiff

not having reviewed the Gohil Sale Agreement.

**B. Misrepresentations regarding the Franchise Agreement**

Defendants' argue that "Dunkin' Donuts represented to the Kuncmans in the Stipulation of Settlement that the Kuncmans' Franchise Agreements were reinstated. In so doing, Dunkin' Donuts misrepresented to the Kuncmans and led the Kuncmans to erroneously believe by Dunkin' Donuts statements and conduct prior to the execution of the settlement documents on November 23, 2004 that it would abide by its obligations under the Franchise Agreements. The Kuncmans have learned . . . that Dunkin' Donuts knew prior to November 23, 2004 that it would not perform those contractual obligations after November 23, 2004." (Defendants' Mem. at p. 8.)

Defendants' contention that the Plaintiff's represented that the "franchise agreements were reinstated" is an incomplete statement of what the First Amendment actually provides. It states: "The parties agree that the Franchise Agreements are hereby reinstated, subject to the terms and conditions of this Agreement, for the sole purpose of permitting the sale to take place. Should the closing be cancelled or should Franchisees fail to timely cure a default hereunder or under the Settlement Agreement, then the Franchise Agreements shall be automatically terminated." (First Amendment at p. 4.)

Defendants' argument is nothing more than a thinly-veiled attempt to convert a breach of contract claim into a claim for fraud. "[U]nder New York law, where a fraud claim arises out of the same facts as [a] breach of contract claim, with the addition only of an allegation that [the other party] never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Telecom Int'l America Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (internal citations

and quotation marks omitted).  "In other words, simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim."  *Id.*

New York law requires that a fraud claim raised in a case that stems from breach of contract, be "sufficiently distinct from the breach of contract claim."  *Bridgestone/Firestone Inc. v. Recovery Credit Serv., Inc.,* 98 F.3d 13, 20 (2d Cir. 1996).  The Second Circuit has laid out three ways by which a party can distinguish its fraud claim from a breach of contract claim.  *See id.*  A party must either "(i) demonstrate a legal duty separate from the duty to perform under the contract . . .; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract . . .; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages . . . ."  *Id*. (citations omitted).   Defendants have not argued the applicability of any of these situations in the present case.  The Courts finds that they do not apply.

## C.  The Misrepresentation Regarding the Review of the Gohil Agreement

Defendants' claim of fraud based on the allegation that Plaintiff misrepresented in June 2004 that Dunkin' Donuts would not review the Gohil Sale Agreement unless Defendants executed the First Amendment when Plaintiff had already "secretly" reviewed it in September 2004 is also without merit.  The alleged misrepresentation occurred during negotiations between counsel and cannot be viewed as anything other than posturing. The June 17, 2004  fax from Plaintiff's counsel on which Defendants' rely reads:

> I communicated your proposal that Dunkin' Donuts review the
> proposed Purchase and Sale Agreement between Got-A-Lot-A-
> Dough and Pradeepsinll Gohil, et al submitted by Lee Albin and

that if it is approved, the parties will execute the First Amendment.
My client rejects this offer and refuses to review the Purchase and
Sale Agreement unless and until the First Amendment has been
fully executed.

Please let me know whether your clients will accept this position and, if not,
when they will de-identify their shops.

Plaintiff's then-stated present intention in June 2004 not to review the Sale Agreement in

the absence of a new settlement document did not preclude Plaintiff from changing its position.

In any event, the central purpose of the 2004 Settlement Documents was the submission and

review of the Gohil Sale Agreement. If Defendants felt that, critical to their decision to enter into

the 2004 Settlement Documents was the absence of any prior review of the Gohil agreement,

they could have protected themselves by inserting appropriate language into the settlement

papers. *See Wurtzbaugh v. Banc of Amer. Sec. LLC*, 2006 WL 1683416 at *7 (S.D.N.Y. 2006)

(citing *Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 196 (2d Cir.

2003)). The review of the Gohil Sale Agreement was not collateral to the settlement and

therefore any reliance by Defendants on alleged assertions that Plaintiff had not reviewed the

purchase agreement was unreasonable. *Wurtzbauch,* 2006 W.L. 1883416 at *7.

Given the acrimonious relationship that existed between the parties, a heightened degree

of diligence was required of the Defendants before relying on any representations of the Plaintiff.

*See Levin v. Gallery 63 Antiques Corp.,* 2006 WL 2802008 at *8 (S.D.N.Y. 2006) (heightened

degree of diligence is required where the victim of fraud had hints of falsity) (quoting *Banque

Franco-Hellenique Commerce Int'l et Maritime, S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir.

1997). That heightened decree of diligence, together with the provision in the First Amendment

that it "and the documents referred to herein shall be the entire, full and complete agreement

14

between Dunkin' Donuts and Franchisees concerning the subject matter" (First Amendment at ¶ 20), precludes any claim of reasonable reliance. *See Harsco Corp. v. Segui*, 91 F.3d 337, 343 (2d Cir. 1996).

The allegations regarding the review of the Gohil Sale Agreement do not support vacatur of the 2004 Settlement Documents on the ground of fraud. The Court's ruling does not, however, preclude the Defendants from attempting to show that Plaintiff breached its duty of good faith in reviewing the Gohil Agreement.

## D. The Singling Out of Defendants

Defendants' final proffer is that, since November 23, 2004, they have learned that Dunkin' Donuts has singled them out for disparate treatment from a period no later than 2001—with full knowledge that the Kuncmans ultimately would be financially destroyed. Although unclear, it appears Defendants are arguing that this scheme was fraudulently concealed from them and justifies vacatur of the 2004 Settlement Documents.

In so far as this claim involves conduct prior to the execution of the 2002 Settlement Agreement (which is unchallenged by Defendants), it is barred by the general release Defendants signed in connection therewith. In any event, the claim that Defendants' knowledge of this scheme came after November 23, 2004 is not well-taken in view of the allegations in the 2004 Affidavit, dated November 18, 2004, concerning "Dunkin' Donuts' Scheme to Terminate and Appropriate Our Franchises." (2004 Affidavit at p. 4.) While Defendants may not have been fully aware of the exact parameters of Plaintiff's alleged scheme, they were sufficiently apprised of it to permit them to validly settle any fraud claims related thereto. *Cf. Bellefonte Re. Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 527 (2d Cir. 1985) (rejecting claim that where the parties

seek to settle a claim of fraud they cannot be bound by settlement agreement unless alleged defrauder makes full disclosure).

In sum, Defendants have failed to proffer sufficient facts and legal authority to support their argument that the 2004 Settlement Documents are void because of fraud, fraudulent misrepresentation, and/or fraudulent inducement.

## II. Evidence of Economic Duress

In addition to fraud, Defendants contend that evidence of economic duress relating to the execution of the 2004 Settlement Documents is admissible even if the underlying facts were "known" to them and that they timely interposed objections to preserve their claims. The Court does not agree. Assuming *arguendo* that the conduct alleged is sufficient to constitute duress,[6] Defendants failed to promptly repudiate the 2004 Settlement Documents.

Under New York law, a "contract is voidable on the grounds of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of free will and duress may take the form of unlawful restraint of property or use of wrongful economic compulsion to force a party to yield to demands that would otherwise be rejected." *Playboy Enter. Int'l Inc. v. On Line Ent., Inc.,* 2004 WL 626807 at * 7 (E.D.N.Y. 2004), *aff'd*, 135 Fed. Appx. 479 (2d Cir. 2005) (quoting *First Nat'l Bank v. Pepper,*

---

[6]Under New York law, threats to enforce a party's legal rights do not constitute duress. *DiRose v. PK Mgmt. Corp.,* 691 F. 2d 628, 633 (2d Cir. 1982). Thus, to the extent Defendants' claim of duress relies upon Plaintiff's stated intention to enforce the 2002 Settlement Agreement, it is insufficient. *See also Wright v. Eastman Kodak, 445 F. Supp. 2d 314, 319 (W.D.N.Y. 2006)* ("Every litigant . . . who is considering whether to accept an offer of settlement has a choice to make: whether to settle the claim for a known sum, or to pursue litigation, which may offer the potential for a greater recovery, but also carries the risk of no recovery at all. That this choice is often difficult to make does not mean that it is made under duress.").

454 F.2d 626, 632 (2d Cir. 1972)).  "A party seeking to avoid a contract because of economic

duress shoulders a heavy burden."  *Int'l Halliwell Mines v. Cont'l Copper & Steal Indus.,* 544

F.2d 105, 108 (2d Cir. 1976).  "Duress may not be found merely from the existence of a difficult

bargaining position or the pressure of financial circumstances.  To succeed on a theory that an

agreement was procured by duress, a plaintiff must show that he was compelled to agree to its

terms by way of wrongful and oppressive conduct that precluded the plaintiff from the exercise

of his own free will."  *Playboy,* 2004 WL 626807 at * 8 (quoting *McIntosh v. Consol. Edison

Co.,* 1999 WL 151102 (S.D.N.Y. 1999), *aff'd,* 2001 WL 1669111 (2d Cir. 2000)).  *Accord Del

Turco v. BRB Ceramic Tiles Marble & Stone*, 2006 WL 2506588 at *6 (E.D.N.Y. 2006).

Because a contract procured by duress is not void but voidable,

> 'the person claiming duress must act promptly to repudiate the
> contract or release or he will be deemed to have waived his right to
> do so. . . .  If the releasing party does not promptly repudiate the
> contract or release, he will be deemed to have ratified it.  A party
> may ratify a contract or release entered into under duress by
> 'intentionally accepting the benefits under the contract,' by
> 'remaining silent or acquiescing in the contract for a period of time
> after he has the opportunity to avoid it' or by 'acting upon it,
> performing under it, or affirmatively acknowledging it' . . . . The
> burden on a party seeking to avoid contractual obligations on the
> grounds of economic duress 'increases proportionately with the
> delay in initiating suit or otherwise repudiating the contract in
> question, since it is well established under New York law that a
> party asserting duress must do so promptly.'

*VKK Corp. v. Nat'l Football League*, 244 F.3d 114,122-23 (2d Cir. 2001) (internal citations

omitted).

In this case, Defendants did not assert the claim of duress until their cross-motion in

opposition to the Order to Show Cause, more than nine months after the 2004 Settlement

Documents were executed.  Under the circumstances of this case, nine months was not prompt as a matter of law. The 2004 Affidavit makes plain that Defendants had sufficient knowledge of the extent of the alleged economic duress under which the 2004 Settlement Documents were signed and the essential conduct that gave rise to the duress to require the Defendants to challenge their validity "promptly after execution or not at all."  *Id.*

As set forth in the 2004 Affidavit, which was executed just days before the execution of the 2004 settlement papers,  Defendants "knew" that "Dunkin' Donuts had a practice of getting rid of franchisees" on "trumped-up grounds" and claimed they were the "recipients" of this "unlawful policy."  (2004 Affidavit at ¶¶ 16 to 18.)  The 2004 Affidavit asserted that Dunkin' Donuts "unlawful scheme" to "financially destroy" Defendants was "successful."  It details how Defendants were pressured into signing the 2002 Settlement Agreement, and how, after exercising its right of first refusal, Plaintiff  tried to "flip" the franchise to the contract vendee at a higher price and ended up ruining the deal. The 2004 Affidavit even refers to Plaintiff's refusal to consider the Gohil Sale Agreement unless Defendants "**make yet further concessions (i.e. further economic extortion) by requiring [them] to sign a proposed amendment to the Settlement Agreement styled "First Amendment to Agreement."** (2004 Affidavit at ¶ 30 (emphasis in original)).

Despite this "knowledge," Defendants did not promptly repudiate the 2004 Settlement Documents.  Defendants did not repudiate the 2004 Settlement Documents after they were signed.  Defendants did not repudiate them after receiving any of the series of default notices.  Defendants did not repudiate the 2004 Settlement Documents when they received Plaintiff's April 28, 2005 letter disapproving the Gohil Sale Agreement.  Rather they continued to take

advantage of the 2004 Settlement Documents. They continued to operate their franchises and submitted the Gohil Sale Agreement to Plaintiff for its consideration. As the Second Circuit has explained:

> The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited the right to do so protects the stability and reliability of such agreements by denying the weaker party the "heads I win, tails you lose" option of waiting to see how the arrangement works out and then deciding whether to seek to undo it. Under this rule, shortly after the execution of a contract or release , the rights and duties under it become free from the doubt engendered by possible assertions of duress. And, importantly for the case at bar, the requirement of prompt disavowal after execution is fair to the disadvantaged party, who will ordinarily know at the time he executes the instrument that he is being economically coerced. He will therefore be able to disclaim the instrument immediately if he was forced into it by economic duress and wishes to avoid its effect.

*VKK Corp v. Nat'l Football League*, 244 F.3d at 123 - 124. Accordingly, delays as short as six months have been held to constitute forfeiture of a claim of economic duress. *See DiRose v. PK Mgmt. Corp.,* 691 F.2d 628, 634 (2d Cir. 1982), *cert. denied,* 461 U.S. 915 (1983) (collecting cases in which delays ranging from six months to two years constituted forfeiture). Here, Defendants are precluded as a matter of law from asserting duress given that they took advantage of the benefits of the 2004 Settlement Documents and failed to promptly raise the claim of duress.

## III. The Handwritten Paragraphs

The final issue to be addressed is the impact of the handwritten paragraph inserted into both the 2004 Stipulation of Settlement and Judgment. That paragraph provides:

> This stipulation and the annexed proposed judgment are subject to
> a Settlement Agreement dated November 15, 2002 and a First
> Amendment dated November 23, 2004 (collectively the
> "Agreement"). The judgment cannot be executed upon, except
> pursuant to the terms of the Agreement.

Predictably, the parties' interpretation of this language is at odds.

Plaintiff argues that, because the Judgment was to be held in escrow and not released unless Defendants breached the terms of the Settlement Agreement and First Amendment, the language prevents Plaintiff from enforcing it absent a breach by Defendants. "In other words, [the judgment] could not be enforced as long as Defendants were in compliance with the settlement documents." (Plaintiff's Memorandum pursuant to Memorandum and Order dated February 10, 2006 at p. 15.) Defendants, on the other hand, contend that the handwritten notation has two principle effects: "[I]it requires Dunkin' Donuts' complete and satisfactory performance of the 2002 Agreement, a condition precedent to the filing of the Consent Judgment and the ancillary relief sought by Dunkin' Donuts on its Order to Show Cause; and . . . it therefore renders the facts bearing upon Dunkin' Donuts' performance - - or failure to perform - - the 2002 Agreement relevant and admissible at trial . . . ." (Defendants' Memorandum pursuant to the February 10, 2006 Memorandum and Order at p. 20-21.)

There are several problems with Defendants' interpretation. First, it ignores the modifications that the First Amendment made to the 2002 Settlement Agreement. Second, it fails to acknowledge that if the language requires "complete and satisfactory" performance of the 2002 Settlement Agreement by Dunkin' Donuts, it must require Defendants' "complete and satisfactory" performance as well. Third, it fails to reconcile the fact that the 2004 Settlement Documents were executed to resolve the parties' dispute over alleged breaches and performance

failures under the 2002 Agreement and Defendants, in fact, signed a general release of all claims existing prior to November 23, 2004.

Without the handwritten language, neither the Stipulation of Settlement nor the Judgment incorporates the terms of the 2002 Settlement Agreement as modified by the First Amendment. It is the First Amendment that sets the schedule of payments due as of March 1, 2005, or the closing of the sale of the franchises. It is the First Amendment that allows for the consideration of the Gohil Sale Agreement as if timely submitted under the 2002 Agreement.[7] Most importantly, it is the First Amendment that provides for the Judgment to be held in escrow and specifies the conditions for its release.

Accordingly, the Court rejects Defendants' contention that the handwritten language requires Dunkin' Donuts' complete and satisfactory performance of the 2002 Agreement and makes relevant Dunkin' Donuts' "failure to perform under the 2002 Settlement." Its insertion into the Stipulation and Judgment was necessary to ensure that the release of the judgment was in accordance with the terms set forth in the First Amendment. The language requires the performance by both parties of the 2002 Settlement Agreement only as modified by, and to the extent not inconsistent with, the First Amendment, including the General Release.

## CONCLUSION

In its February 10, 2006 Memorandum, the Court clearly stated that "if the submissions

---

[7] In their Reply Memorandum, Defendants argue, based on their interpretation of the handwritten language, that Plaintiff violated the 2002 Agreement "by breaching the Franchise Agreements and denying approval of the 2004 Purchase and Sale Agreement in bad faith." Reply Mem. at p. 7. However, Dunkin' Donuts had no obligation to review the "2004 Purchase and Sale Agreement" under the 2002 Settlement Agreement. Indeed, the absence of any obligation to review that agreement was the *raison d'etre* for the First Amendment.

do not support Defendants' position, no evidence, other than possible background information, will be received that predates November 23, 2004."  For the reasons set forth herein, the submissions do not support Defendants' position.  Accordingly, no evidence that predates November 23, 2004, other than possible background information, will be received at the trial of this action.

     **SO ORDERED.**

Dated:  Central Islip, New York
     December 18 , 2006                 _____/s/_____

                                     Denis R. Hurley
                                     United States Senior District Judge